Jackson *v.* Grant.

---

## JACKSON *vs.* GRANT.

1. A defendant, in his cross-bill, cannot set up a case inconsistent with the case made in his answer to the original bill.

2. Where a sale of stock of a corporation was made in consideration, in part, of a promise that the corporation would not set up any claim against the vendor of such stock, on account of past transactions, and in violation of such stipulation, the company brought a suit, it was held that such stipulation was not a condition on which the title of the stock depended, and that, consequently, the title to such stock did not revert in the vendor.

3. The principal stockholders of a solvent company having agreed, for a consideration, that they would not claim anything on certain old accounts against a former officer of the company, it was intimated that a suit,

making such claim in the name of the company, might, in equity, be considered a breach of such agreement, so far as the avails of such suit would go to the benefit of such stockholders.

This cause was argued upon a motion to dissolve the injunction. The facts of the case fully appear in the opinion of the master.

*Mr. Williamson* and *Mr. Browning,* in support of the motion.

*Mr. Woodruff,* (with whom was *Mr. Bradley,*) contra.

THE CHIEF JUSTICE, sitting as master.

The original bill in this cause was filed on the 21st of February, 1865, by Oliver D. F. Grant, against John Hopper and the above named defendant, James Jackson. Its object was to compel the specific performance of a contract between said James Jackson and said Grant, entered into on the 27th of August, 1864, for the sale, by the former to the latter, of certain shares of the capital stock of "The New Jersey Locomotive Company," which were alleged to have a fictitious value to the purchaser. The number of these shares thus alleged to have been sold, was twelve hundred and fifty, including in this number, however, three hundred shares standing in the name of John Hopper, who held them as the trustee of Mr. Jackson's wife, the clause in the bill being, with regard to them, that the defendant, Jackson, at the time of the sale, had agreed to " do all that he could to have the said John Hopper transfer the said shares " to the complainant. The price of the stock agreed upon, is stated to have been one hundred dollars a share. The bill then alleges that nine hundred and forty-five shares of those thus sold, were transferred to the complainant, and were duly paid for by him; that the three hundred shares, standing in the name of Mr. Hopper, were under the control of Mr. Jackson, and that he could, by requesting it, have obtained their

Jackson *v.* Grant.

transfer; but that he had wrongfully neglected to do so, and that neither that portion of the shares so purchased, nor the remaining five shares, had been assigned to the complainant. The prayer of the bill is that the contract of sale, in these respects, should be decreed to be specifically performed.

This bill has been answered by both of the defendants. In this answer, Mr. Jackson admits the sale of nine hundred and fifty shares of the stock in question, at the time stated, but he denies that he sold the three hundred shares, the legal title to which was vested in Mr. Hopper. With regard to them, his averment is that he promised, if he ever got them, he would sell them to the complainant; but he denies that he stipulated to part with them at any definite price. It also appears from the original bill, and this answer, that the sale referred to above, was effected through the agency of one Samuel Smith, and that Aaron S. Pennington, esq., as the counsel of Mr. Jackson, was present, and assisted in making the contract, which was by parol; and that a few days thereafter, Mr. Pennington drew up, in writing, a memorandum of the transaction, and of the contract, which was signed by himself and Mr. Samuel Smith. This memorandum is set out at length in the answer now analyzed; and from this it appears that there were certain terms of the contract for the sale of the stock in question which were not set out in the original bill, and which will be alluded to in the sequel. The answer then sets up certain matters in excuse, on the part of Mr. Jackson, for his failure to transfer the remaining five shares of the stock admitted to have been sold, and proffers himself ready to comply with his contract in this particular.

A replication having been put in, witnesses were examined on both sides, and a rule taken, on the part of the defendants, to close testimony, which expired on the 8th of March, 1866.

At this stage of the proceedings, on the 12th of March, four days after the time limited in the rule to close testimony had elapsed, the defendant, Mr. Jackson, presented his petition to the Chancellor for leave to file a cross-bill in the

cause. The substantial grounds of this application were two-fold, viz.: first, that the sale before mentioned, of the nine hundred and fifty shares of stock, was made upon the express condition, in the language of the petition, " that the said Oliver D. F. Grant, David Beach Grant, and Benjamin Salter, would not, and that said company would not, claim anything of your petitioner on account of any claims or accounts which said company pretended to have against him, and that they would not bring any suit against him on account thereof." In this connection the petitioner avers the breach of this condition, and declares that on the 17th of December, 1864, the "said Oliver D. F. Grant, Benjamin Salter, and David B. Grant, caused to be filed in the name of said company, in this court, a bill against your petitioner, claiming over a hundred thousand dollars on account of said claims, in direct violation of said conditions, and on February 7th, 1865, filed an amended bill in the same cause, claiming a still larger amount on account thereof, the said Oliver D. F. Grant personally attending the prosecution thereof, on the examination of witnesses in the case." The second ground on which the petition is based, is an alleged fraud on the part of Mr. Oliver D. F. Grant, in procuring from the petitioner the sale and transfer of the nine hundred and forty-five shares of the stock above mentioned. Specifications of these fraudulent acts are set forth in the petition, which it is unnecessary to notice.

On the 14th of March, 1866, the Chancellor granted the defendant leave to file a cross-bill, pursuant to the prayer of said petition, and accordingly, on the 31st of the same month, a bill of that description, which gives rise to the questions to be decided by me at this time, was duly exhibited by Mr. Jackson in this court. It is sufficient for my present aims, to say that the substance of that bill consists in a re-statement of the facts before alluded to, contained in the petition, viz.: the fraud in procuring the contract of sale, and the specified conditions of that contract, and their violation. As the

legal result of this condition of affairs, it is claimed that the contract being annulled by the fraud, or by the breach of the conditions, the complainant has a right to a return of the nine hundred and forty-five shares of stock heretofore transferred by him to the defendant, upon the repayment of the consideration received for them, which he tenders himself ready to make. The general prayer of the bill is to that end. It also appears from this bill, that just previous to its being filed, a notice was given of a meeting of the stockholders of the New Jersey Locomotive and Machine Company, for the purpose of taking into consideration the propriety of dissolving the corporation. The charter of the company authorizes this step to be taken "at a meeting of the stockholders specially convened for that purpose; provided that at least three fourths, in amount or value, of the stockholders shall be present or represented therein." The bill alleges that the defendant, Mr. Oliver D. F. Grant, designs to make use of the nine hundred and forty-five shares of stock in dispute, for the purpose of occasioning the dissolution of the company; and an injunction is asked to prohibit such use, or the transfer of such stock, during the pendency of this suit. An injunction having been allowed, agreeably to this prayer, the motion now before me is to order its dissolution.

Upon the argument, a question was raised which, as I do not think at this stage of the cause it can be properly decided by me, I will dispose of before proceeding to the merits of the case. It was insisted by the counsel of the defendant, and by defendant, I mean Mr. Oliver D. F. Grant, who occupies that position in this cross-bill, that by the well settled rules of practice, if not by the fundamental principles which regulate proceedings in courts of equity, a complainant in a cross-bill cannot make or set up a case different from, and certainly not one inconsistent with, the substantial defence contained in his answer to the original bill; and it was said that the cross-bill now under consideration violates, in the clearest manner, this important maxim. That the general principle thus asserted exists, and that it is necessarily inhe-

rent in the rule which requires from a defendant a full and conscientious disclosure of his entire defence in his answer, and is therefore of considerable moment, cannot be denied. In a proper case, when free to act, I should be inclined to enforce the rule with inflexibility. If the defence appearing in an answer, be defective by reason of excusable mistake, such answer should be amended so as to correspond, in its material statements, with the contemplated cross-bill. It certainly seems difficult to understand how, without a wide departure from the orderly conduct of a cause in a Court of Chancery, a case is to be finally disposed of, which raises one issue on the original bill, and an entirely different and irreconcilable issue on the cross-bill. And this appears to me, as at present advised, to be the aspect of the case now before me.

The issues on the original bill and answer are two, viz.: first, whether the defendant therein agreed to endeavor to procure the transfer of the three hundred shares of stock held by Mr. Hopper; and second, whether he sufficiently excuses himself for not having transferred the other five shares which the bill demands. These are the only questions to be decided on this original bill and the answer to it. The issues raised on the cross-bill are also two, viz.: first, whether the entire contract of sale was not procured from Mr. Jackson by fraud; and second, whether such sale, if fairly made, was not defeasible on the non-performance of a condition subsequent. The points for adjudication therefore, appearing on the face of these successive pleadings, are evidently not the same in substance or effect, and it may, perhaps, be claimed that these statements of defence are so opposite and antagonistic that they cannot be permitted to stand together in the same cause, and that, as the original answer cannot be dispensed with, the cross-bill must eventually fall. But this question, as to the propriety of permitting this new defence to be interposed in this manner, I do not feel authorized, on this reference, to decide. The point has already been passed upon by the Chancellor, and I do not conceive that, upon the present motion, I have the power to review that decision. When the com-

plainant presented his petition, the precise point to be set-
tled was, whether these facts, variant from the facts in the
answer, might be exhibited in court in the form of a cross-bill.
Such permission was given, and I should not feel justified in
dismissing the injunction on the ground that such order was,
as a matter of correct practice, erroneous. I shall therefore
decide the motion on the merits of the case as disclosed by
the cross-bill, the answer to it, and the proofs.

It is obvious, upon the surface of the case, that the con-
tinuance of the injunction must depend on the right of the
complainant to require a re-transfer of the nine hundred and
forty-five shares of stock in question. As has been already
above stated, this right to a return of this stock is vested in
the cross-bill on two grounds, viz. : first, the fraud of the
defendant in procuring from the complainant the sale and
transfer of the shares ; and second, the existence in such con-
tract of a condition subsequent, which has been infringed.

The first of these points I shall dismiss without any dis-
cussion, and with the remark that I cannot discover anything
whatever in the pleadings or proofs which appears to justify
so serious a charge. It seems to have originated at a late
period of the controversy, in suspicions of the complainant,
arising from trivial circumstances, or from facts in part mis-
understood. Indeed, the point was not deemed of sufficient
consequence to form a topic for argument by the senior
counsel of the complainant, and I therefore pass it without
further comment.

The motion, consequently, must be decided, if the decision
is to be in favor of the complainant, on the second ground.
Let us examine the position in this respect, taken in the
cross-bill.

The complainant asserts that he made the sale of his stock
on the *condition* that neither *the New Jersey Locomotive and
Machine Company,* nor the said Oliver D. F. Grant, David
Beach Grant, nor Benjamin Salter, personally, as individuals
and as stockholders in said company, would ever claim any-
thing of him on account of any claims between him and the

said company. As an exhibition of a direct violation of this condition, as he denominates it, he shows that the company, after such agreement, filed a bill against him for claims embraced in such condition. It appears from the pleadings, that a certain account of the complainant against the company, exceeding in amount one hundred thousand dollars, had, prior to the date of the contract in controversy, been approved of and passed by the board of directors; but that the defendant had called in question the fairness of that transaction, and had threatened an investigation. If, therefore, in consideration of the sale of his stock, the complainant was promised by the company that his past transactions with it should not be disturbed, but should be allowed to sleep, it was certainly a most important feature of the contract. The first inquiry therefore is, was such a stipulation part of the contract of sale?

I have not the least doubt on this subject. It appears in the case, to my entire satisfaction, that no such promise as this was ever made to the complainant. Reading the transaction in the light of evidence which it seems to me cannot be disputed, it is difficult to see how the complainant had persuaded himself that the stipulation in question was incorporated in his contract. The evidence on this head presents these conclusive facts. The contract was by parol; but, a few days after it was made, a written memorandum of the agreement, with the knowledge of the complainant, was drawn up by his own counsel. That writing, thus framed, was signed by Mr. Pennington, the counsel, and by Mr. Samuel Smith, the admitted agent of the complainant in making the sale, and in this condition was shown by Mr. Pennington to the complainant. Mr Pennington has been examined as a witness, and he deposes that the statements of this memorandum are true. This writing, thus authenticated, being signed by the counsel and agent of the complainant, and unchallenged by him at the time in any particular, must, as an instrument of evidence, be considered as entitled to very great weight. Indeed it seems to fall little short, considered in its effects, of a

contract signed by the party to be charged. Now, if we are to resort to this memorandum as the depository of the parties' intentions, the contention of the defendant must be at once exploded. The memorandum is express upon this point. It states that Mr. Jackson instructed Mr. Smith, his agent, to make a demand that the company would release all claims for the past. And what occurred on the presentation of this demand, is recorded in these words: " We met, and the party objected that the company could not give any such release. Samuel Smith and A. S. Pennington then went to see Jackson, and he agreed that if O. D. F. Grant, D. B. Grant, and B. Salter, would *personally agree that as stockholders* they did not mean to claim anything from him on those old accounts, and so far as they were concerned, they would not, that then he could proceed with the purchase. This we reported, and they severally made the promise." Here then we find in this writing of the highest authenticity, and which was made almost cotemporaneously with the transaction which it purports to record, that this identical proposition of a release of these claims against the complainant, on the part of the company, was proposed and rejected, and that in lieu thereof, the complainant consented to take the individual stipulations of the stockholders. Nor does the testimony on this head end here. It is clearly in evidence that, until about the time of filing the cross-bill, the complainant himself never pretended that the condition now claimed was embraced in this contract. This is signally evidenced. Thus, in his answer to the suit brought by the company against him, instead of setting up that this company had agreed not to make this claim against him, we find him stating the agreement precisely as it is set forth in Mr. Pennington's memorandum. The language of this answer, which is put in under oath, is as follows: " That the said Oliver D. F. Grant, David Beach Grant, and Benjamin Salter afterwards, and as an inducement to this defendant to sell his stock at one hundred dollars per share, *did personally agree that as stockholders they did not* mean to claim anything from him on the old accounts

of the said company against him, and would not." But there is no pretence whatever in this answer, that the company ever made such a stipulation. And I think the statement in the complainant's answer to the original bill in this case now before me, is equally clear and emphatic to the same purpose, for the answer copies the memorandum at length, and although it denies that the complainant authorized a sale of the stock, the title to which was placed in Mr. Hopper, it does not allege that in any other respects the memorandum is not correct. It was suggested on the argument, that in the other parts of this answer it is said the stock was sold on conditions, and that the conditions referred to do not appear in the answer. But this is not the natural or true construction of the allusive terms thus used; the conditions to which they relate are evidently the stipulations contained in the memorandum of Mr. Pennington. Under these circumstances, I think it appears to demonstration in the case, that there was never any such agreement as that set up by the complainant in his cross-bill in regard to the particulars under consideration. My conclusion from the proofs now before me is, that it was no part of the agreement, that the company would not proceed by suit or otherwise against the complainant with regard to any matters whatever.

The question therefore then arises, whether the suit which the company has brought against the complainant, is a violation of any part of the agreement between the complainant and the defendant. It is obvious that a suit of a certain character could have been brought by the company against the complainant, which, with regard to this contract, would appear to be entirely unobjectionable. The precise agreement, as extracted from the memorandum of Mr. Pennington, was, it will be remembered, that Oliver D. F. Grant, D. B. Grant, and Benjamin Salter, personally agree that as stockholders they did not mean to claim anything on the old accounts, and so far as they were concerned they would not; and I think, therefore, it is clear that if the company were insolvent, so that any moneys which might be recovered

Jackson *v.* Grant.

on its old accounts against the complainant, would go to its creditors, and would not enure to the benefit of its stockholders, a suit in behalf of the corporation against the complainant for such a purpose, would not be an infringement of the agreement above set forth. From the results of such a suit, the defendant, as a stockholder, would derive no benefit. But when the company is in a prosperous condition, the result of a suit would be far different. The proceeds of such a suit would then go to increase the value of the stock; and under such conditions, the stockholders would be the only parties to be benefited by the proceedings. To say the least of it, it might be contended with considerable force, that a suit brought in the name of the company, against the complainant, by the stockholders, at a time when the entire avails of such suit would pass into the surplus earnings of the company, is for all practical purposes a claim made by such stockholders, and is thus, in substance, a breach of that stipulation in their contract, not to make such claim. But this point was not discussed on the argument, and as its consideration will enter necessarily into the decision of the controversy now pending between the complainant and the company, and as it seems to me the present case can be disposed of on another ground which is free from all difficulty, I shall not decide this question, but will assume, for present purposes, that the institution of such suit, in the manner set forth in the cross-bill, was an infringement of the stipulation to which the foregoing remarks have been applied.

This last assumption, it will be perceived, leaves remaining but a single inquiry: what is the legal character of the stipulation thus, for the purposes of the argument, admitted to have been broken? Is it *a condition* in the legal sense of the term? If it be such, it became annexed to the title to the stock, and when the act was done in violation of it, defeated that title. It is only upon the ground of the existence of a strict legal condition of this character, that the complainant can base his demand of a reconveyance of the shares

of stock in question. This inquiry presents simply a question of intention. Did the contracting parties mean that if, at any future time, the defendant and his associate stockholders, or any of them, made any claim on the old accounts of the corporation against the complainant, his title to the stock which he purchased should be defeated? Such a stipulation is so unusual in sales of personal property, that all natural implications would be against the construction which would adopt it. It should be received only from the presence of language which will admit of no other rational signification. But upon any rules of construction, however lax, I do not find any ground, in the present case, upon which to found a pretence that this sale was upon a condition subsequent. It is true that the complainant, in his cross-bill, alleges the existence of such a condition; but in his answer to the company's bill, and in his answer to the bill in this cause, his statements, in the clearest manner, show that the contract was possessed of no such feature. What the parties or witnesses now choose to designate the stipulation in question is of no importance; what the parties said and did when forming the contract are the only guides to a correct construction.

Looking then to the language employed at the time of the transaction, it seems to me impossible for any person to have a doubt upon the subject. The statement of Mr. Pennington, both in his memorandum and in his evidence, and which statement on this point is not in the least contradicted, or in any wise impeached, is most explicit, and is to the effect that the complainant agreed " that if O. D. F. Grant, D. B. Grant, and Benjamin Salter would *personally agree* that as stockholders they did not mean to claim," &c. Now it is clear that it was the *agreement* on the part of the stockholders, and not the performance of that agreement, which formed the consideration of the sale, just as much so as, on a sale of a chattel on a credit, the promise to pay in the future forms the consideration on which the vender parts with his property. The principle which would characterize this agreement on the part of the stockholders as a condition subse-

quent, running with and defeating, upon its breach, the title to the stock now in controversy, would, in all contracts of sale of chattels, convert every promise to do, or not to do, some future act, into a condition, upon which the ownership of the articles sold would be made to depend. Such a doctrine is countenanced by no authority, and is opposed to all the well settled rules of law which belong to this subject. I am satisfied that the stipulation in the contract in question was not a condition, and therefore its violation does not affect the title of the defendant to the shares of stock which have been transferred to him. This being the result of my consideration of the case, I shall advise his honor the Chancellor to dissolve the injunction with costs.

I may add that, at one stage of my consideration of the matters involved in this discussion, I had some doubt whether the defendant, by prosecuting the suit in the name of the company against the complainant, and justifying such act on the ground that, since entering into the agreement not to prosecute as a stockholder, he had discovered sundry frauds which the complainant had perpetrated towards the company, and which were unknown to him at the time he so bound himself, was not such an abandonment of the contract on his part that the complainant had the right to consider it a recision of it. It is not very readily to be perceived how the defendant can refuse to perform, on the ground of fraud in the other contracting party, acts on his part which constitute a portion of the consideration of the stock which he holds, without, at the same time, revoking, on the same ground, the entire contract. I am not aware of any principle on which a party can be permitted, for alleged fraud, to rescind such part of a contract as is a burthen to him, and to retain the residue which is beneficial. And if the complainant, upon the inception of the proceedings in this court by the company against him, had treated such act as a recision of the entire contract by the defendant, I confess such a position of the case would have presented a problem which I should have considered worthy of a careful examination. But the complainant did not

see fit to treat the contract as rescinded by the defendant; on the contrary, he interposed it as a defence in the suit of the company, and at that time appears to have been willing to consider it annulled, only in the event of its failing him as a protection against that proceeding. So in his answer to the bill in the present case, he has dealt with it as a subsisting contract. And in that light, under these circumstances, I feel constrained to regard it.

In conclusion, I may remark that, since the argument, I have read over all the pleadings and proofs belonging to this case, and that I have carefully considered all the points raised by counsel.